

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

LKG/KDE

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

July 20, 2018

By ECF, E-Email and Hand

The Honorable Dora L. Irizarry
Chief United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Ronald Giallanzo
               Criminal Docket Nos. 17-155 (S-1) & 06-181 (DLI)

Dear Chief Judge Irizarry:

      The government respectfully submits this letter in advance of the defendant Ronald Giallanzo's sentencing, which is scheduled for August 8, 2018 at 10:00 a.m. In light of the factors set forth in 18 U.S.C. § 3553(a), the government recommends that the Court impose a sentence of 97 months' imprisonment for his racketeering conviction, to be followed by a consecutive sentence of 24 months' imprisonment for his violation of supervised release.

I.      Background

      On March 19, 2018, the defendant pleaded guilty to Count One of the above-referenced superseding indictment (the "Indictment"), which charged the defendant with racketeering conspiracy between January 1,1998 and September 14, 2017, for the crimes he committed as part of his membership in the Bonanno crime family of La Cosa Nostra (the "Bonanno crime family"). See Pre-Sentence Investigation Report ("PSR") ¶ 1. The defendant was charged in the Indictment based on his longtime membership in the Bonanno crime family, and his criminal conduct on its behalf. PSR ¶¶ 2-6. As of the time of his arrest, the defendant held the rank of acting captain in the Bonanno crime family, and he ran a loansharking operation in which he extended in excess of a million dollars in loansharking money. See Addendum to the PSR ("PSRA") at 5. The defendant collected the proceeds from his loansharking business, as well as his illegal gambling business and other illicit ventures, through violence and threats of violence. PSR ¶¶ 19 & 25. As a result, the defendant lined his pockets with illicit proceeds and lived a lavish lifestyle. Id.

The defendant operated and controlled his loansharking business for over seventeen years—eight of those years from prison, and the final years on supervised release. The defendant managed and profited from his business by directing a crew of loyal soldiers and associates willing to do his bidding, including enforcing collection of the defendant's money through violence and threats of violence, enriching not only the defendant, but also his family and his crime family beyond measure at the expense of the Howard Beach community. All of the defendant's loansharking customers paid the defendant and his co-conspirators out of fear for their physical safety if they did not satisfy the exorbitant weekly interest rates. PSR ¶ 25.

Through his illegal proceeds, the defendant was able to spend in excess of a million dollars to purchase, reconstruct and furnish a mansion in Howard Beach, which was a daily visual reminder to those in his neighborhood of his wealth and power. (Compare Ex. A (picture of property before acquired by the defendant) with Ex. B (picture of property as renovated by the defendant) and Ex. C (picture of the defendant's prior home)). The defendant and his wife together reported a total of approximately $305,000 in income from 2005-2016 (approximately $25,000 per year). Notwithstanding, they were able to purchase the house without any mortgage and begin months of construction and renovation to build their dream home. In addition to compiling tremendous (albeit, ill-gotten) wealth, the defendant solidified his position in the Bonanno crime family and power in the Howard Beach community through numerous acts of violence, including arson, extortion and assault. PSR ¶ 20.

As part of his plea to Count One of the Indictment, the defendant allocuted to Racketeering Acts 19, 29, 30, 32 and 33. PSR ¶ 2. Each of these racketeering acts is described below.

    A.    Racketeering Act 19: Extortionate Extension and Collection of Credit – John Doe #4

Between June 1, 2007 and April 4, 2017, the defendant, together with co-defendants Michael Padavona, Nicholas Festa, Michael Hintze and others, extended one or more extortionate extensions of credit to John Doe #4 and used extortionate means to collect and attempt to collect one or more extensions of credit from John Doe #4 and to punish John Doe #4 for the nonrepayment thereof. PSR ¶ 46.

After John Doe #4 had a falling out with co-defendant Michael Palmaccio about a loanshark debt he owed to Palmaccio, the defendant took advantage of the situation and told John Doe #4 that he could help him. Shortly thereafter, John Doe #4 borrowed $5,000 from the defendant at two "points," or $100 in interest each week. Even after the defendant went to jail, he continued to extort John Doe #4 and loaned additional money to John Doe #4 through Hintze. Eventually John Doe #4 owed the defendant $40,000 in principal. John Doe #4's weekly interest payments reached amounts of $600 and $700. On a lawfully intercepted recording, John Doe #4 stated that he has made approximately $260,000

in payments to the defendant and his associates over the ten-year period between June 1, 2007, and April 4, 2017.  Id.

  B.  Racketeering Act 29: Extortionate Extension and Collection of Credit – John Doe #18

  Between January 1, 2012 and March 28, 2017, the defendant, together with co-defendants Padavona and Robert Tanico and others, extended one or more extortionate extensions of credit to John Doe #18 and used extortionate means to collect and attempt to collect one or more extensions of credit from John Doe #18 and to punish John Doe #18 for the nonrepayment thereof.  PSR ¶ 57.

  In 2012, John Doe #18 borrowed approximately $2,000 from Padavona and made weekly payments of $200, which did not reduce the principal.  In 2014, John Doe #18 could no longer make the weekly payments he owed to Padavona.  At that point John Doe #18 borrowed approximately $6,000 or $7,000 from Palmaccio and made $100 weekly interest payments that did not reduce the principal.  On one occasion, after falling behind on payments to Palmaccio, John Doe #18 was asleep in his cab in the early morning when he was woken by someone knocking on his cab window.  The individual, who John Doe #18 recognized from the neighborhood, punched him in the face and later hit him with a pipe.  John Doe #18 fled the scene after the individual struck him with the pipe.  After the assault, John Doe #17 saw John Doe #18's injuries and told John Doe #18 to inform Padavona that John Doe #18 had borrowed money from Palmaccio and had been assaulted.  John Doe #18 later saw the defendant and discussed the incident.  The defendant stated that he and Padavona would not let John Doe #18 be hurt again.  Thereafter, Padavona took over the loan.  As of September 2016, John Doe #18 was making weekly interest payments of $350 on the loan.  PSR ¶¶ 57-59.

  C.  Racketeering Act 30: Extortionate Extension and Collection of Credit – John Doe #19

  Between July 1, 2012 and December 31, 2013, the defendant, together with co-defendant Robert Pisani and others, committed acts involving extortion by compelling and inducing John Doe #19 to deliver property by instilling in him a fear that if the property were not so delivered, he would be injured.  PSR ¶ 60.

  In 2012, John Doe #19 began betting with Pisani's online gambling operation.  Within a month, John Doe #19 fell into debt.  Approximately two years later, just around the time the defendant was released from prison, John Doe #19 heard people talking in the neighborhood about John Doe #19 owing money.  He also heard that the defendant was looking to hurt someone over a debt, but did not realize that person was him.  One day, a Bonanno family associate assigned to the defendant ("Associate-1") approached John Doe #19 in a gym and asked if he owed $1,400, which John Doe #19 tried to deny.  Associate-1 told John Doe #19 that he owed the money to the defendant and Pisani.  A few days later, a person John Doe #19 believed to be the defendant called John Doe #19 on the phone and

3

said, in sum and substance, "I don't have to say any more, you know you owe the person money, you gambled, when you lose, you pay." John Doe #19 understood the defendant to be associated with organized crime. A week later, the same person called and told John Doe #19 that he wanted $100 per week on the debt. John Doe #19 had heard that the defendant had come home from prison and started collecting money, and he also heard that the defendant was saying that he was going to hit John Doe #19 with a bat.[1] In total, John Doe #19 paid the defendant and his associates approximately $6,000. Id.

      D.      Racketeering Act 32: Extortionate Extension and Collection of Credit – John Doe #20

Between January 1, 2013 and March 13, 2014, the defendant, together with co-defendant Padavona and others, extended one or more extortionate extensions of credit to John Doe #20 and used extortionate means to collect and attempt to collect one or more extensions of credit from John Doe #20 and to punish John Doe #20 for the nonrepayment thereof. PSR ¶ 68.

In approximately 2013, Associate-1 gave John Doe #20 a $25,000 loanshark loan, which came from the defendant. John Doe #20 made $400 weekly interest payments to Associate-1, none of which detracted from the principal. Associate-1 was often with the defendant when John Doe #20 made the weekly interest payments. In early 2014, John Doe #20 fell behind on payments. Associate-1 threatened to harm John Doe #20 if he did not pay. Id.

In early 2014, after Associate-1 fled New York (with some of the defendant's money), Padavona called John Doe #20 asking him where he lived and told him he would be coming by with "him," i.e., the defendant. That same day, the defendant and Padavona drove together to John Doe #20's house and interrogated him about Associate-1's whereabouts and the defendant's other loanshark debtors (a meeting that was recorded). John Doe #20 told the defendant that he did not know where Associate-1 was, and that he owed Associate-1 $25,000 but Associate-1 had "knocked down" that amount to $16,000. The defendant urged John Doe #20 to think about how to "knock me down" further with respect to what was owed on the loan. The defendant further said that he was not going to "raise [his] hands" to John Doe #20, but that if he lied to the defendant, the defendant would "fuck [John Doe #20] up." At one point, Padavona asked the defendant from the car whether the defendant wanted "us" out there, to which the defendant said no. The defendant concluded by telling John Doe #20 to take a couple of days to think about how to knock down what he owed the defendant, and then to reach out to another individual, who would tell the defendant's friend Mike (Padavona). The total loss to John Doe #20 was $20,000. Id.

---

[1] The government does not have any other indication that the defendant was in fact telling people he was going to hit John Doe #19 with a bat.

4

      E.      Racketeering Act 33: Extortionate Extension and Collection of Credit – John Doe #21

Between April 13, 2013 and March 28, 2017, the defendant, together with co-defendants Padavona, Tanico, Angelo Moccia and others, extended one or more extortionate extensions of credit to John Doe #21 and used extortionate means to collect and attempt to collect one or more extensions of credit from John Doe #21 and to punish John Doe #21 for the nonrepayment thereof.  PSR ¶ 70.

Just before Hurricane Sandy hit in October 2012, John Doe #21 had invested $125,000 in a new business.  Unfortunately for John Doe #21, his business was destroyed in the storm.  Like many other afflicted business owners, John Doe #21 endeavored to rebuild.  John Doe #21 borrowed $50,000 from the defendant at a rate of $500 each week.  Like the defendant's other victims, the weekly interest payments did nothing to reduce the principal.  About a month later, John Doe #21 borrowed an additional $40,000 from the defendant and later an additional $5,000 for a friend, increasing the principal to $95,000, with weekly interest payments of $950.  John Doe #21 made the weekly payments to Padavona and Tanico until an incident where he was berated by Padavona.  The defendant then instructed Moccia to make the weekly collections.  But Moccia's state arrest on gambling charges disrupted his ability to collect, so Padavona took over again.  John Doe #21 paid approximately $190,000 over the course of the loan.  Id.

II.      Applicable Law

In Gall v. United States, 552 U.S. 38 (2007), the Supreme Court set forth the procedure that sentencing courts must follow in light of United States v. Booker, 543 U.S. 220, 258-60 (2005):

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.

Gall, 552 U.S. at 49 (citation omitted).  Next, a district court must "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, [a district court] may not presume that the Guidelines range is reasonable.  [A district court] must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted).

Section 3553(a) directs the sentencing court to consider the following factors, among others, when imposing a particular sentence: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; and (2) the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to

provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; and (C) to protect the public from further crimes of the defendant.

At sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, Title 18, United States Code, Section 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Thus, the Court must first calculate the correct Guidelines range, and then apply the Section 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

III.   Guidelines Analysis

The parties agree that the Guidelines calculation set forth in the PSRA, which yields a Guidelines range of imprisonment of 87 to 108 months (with the one-point global reduction), given that the defendant is in Criminal History Category III, should be applied here:

| | |
|---|---:|
| Highest Offense Level | 22 |
| Plus: Grouping Units (§ 3D1.4) | +5 |
| Plus: Aggravating Role (§ 3B1.1(a)) | +4 |
| Less: Global Resolution (§ 5K2.0) | -1 |
| Less: Timely Acceptance of Responsibility (§ 3E1.1) | <u>-3</u> |
| Total Offense Level: | <u>27</u> |

IV.   Section 3553(a) Factors Weigh in Favor of a Guidelines Sentence

For the reasons set forth below, the government respectfully requests that the Court impose a sentence of 97 months' imprisonment.[2] Such a sentence is appropriate given the nature and characteristics of the offenses, the history and characteristics of the defendant, and the need for the sentence to reflect the seriousness of the offenses, to promote respect for the law, to provide just punishment, to afford adequate deterrence and to protect the public.

---

[2] Although the parties agree that the correct Guidelines calculation is 87 to 108 months' imprisonment for the reasons set forth above, and it not bound by its prior estimate set forth in the plea agreement (which contemplated a range of 78 to 97 months' imprisonment), in an exercise of discretion, the government only recommends a sentence of 97 months.

6

A. <u>Nature and Circumstances of the Offenses</u>

The defendant has been convicted of racketeering conspiracy, including, as predicate acts, extending extortionate credit to five separate victims and using extortionate means to collect and attempt to collect on those loans, all in connection with his leadership role in the Bonanno crime family. The defendant operated and controlled his lucrative loansharking business for over 17 years—eight of those years from prison, and the final years on supervised release. PSR ¶ 25. These are serious crimes that warrant a serious punishment. 18 U.S.C. § 3553(a).

As the Court is aware, the Bonanno crime family is a dangerous criminal enterprise that uses violence to achieve the objectives of the enterprise. PSR ¶ 15. The defendant's longtime membership in the Bonanno family reflects his commitment to its violent goals and enabled him to commit the racketeering acts to which he admitted. For example, when a loanshark customer failed to make a timely payment, the violent reputation of the Bonanno family, and specifically the defendant and the soldiers and associates who reported to him, enabled the defendant to obtain payment by extortion, that is, through the credible threat of violence.

Significantly, the defendant himself did not hesitate to make threats of physical violence, as evidenced by his recorded statements to John Doe #20, stating he would "fuck [John Doe #20] up." PSR ¶ 26. Nor did the defendant hesitate to use violence. The defendant took part in the assault of John Doe #2 and John Doe #3, stock brokers who dared to leave a firm associated with the defendant and other members of organized crime. These victims were beaten with a telephone. PSR ¶ 29. And after the assault, the defendant got what he wanted—$50,000 from the victims. <u>Id.</u> When it came to John Doe #14, the defendant again resorted to actual violence.[3] John Doe #14's admission that he used some of the defendant's loanshark money to make payments on his house sent the defendant in rage. PSR ¶ 51. The defendant smacked John Doe #14 to the ground. <u>Id.</u> The defendant and Associate-1 then dragged John Doe #14 to Associate-1's vehicle and viciously beat John Doe #14 until he soiled himself, with the defendant screaming, "Where's the fucking money?" <u>Id.</u> This conduct shows the defendant's obsession with controlling and maintaining his loansharking empire. And his violent reputation and relentlessness took a toll on his victims and their families. In the end, John Doe #14 was forced to sell his home. <u>Id.</u>

---

[3] Although the defendant does not dispute that he assaulted John Doe #14, or that John Doe #14 failed to make timely interest payments, the defendant objected to portions of the factual narrative in the PSR regarding John Doe #14. <u>See</u> Def. PSR Objection Ltr. dated June 4, 2018 at 4. The government subsequently indicated that it did not dispute that John Doe #14 had a prescription drug addiction that exacerbated his ability to make weekly interest payments and provide for his family. <u>See</u> Gov't PSR Objection Ltr. dated June 18, 2018 at 3-4. With those caveats, the defendant no longer had any objections to the narrative. <u>See</u> Def. PSR Objection Ltr. dated June 18, 2018.

B.  Defendant's History and Characteristics

The defendant's history and characteristics indicate that he is committed to a life of crime, that a 97-month sentence is appropriate, and that a more lenient sentence is not. 18 U.S.C. § 3553(a).

The defendant has been an inducted member of the Bonanno crime family for over 20 years and has held the rank of acting captain since the 2014 arrests of Bonanno captains Jerome Asaro, the defendant's first cousin, and Jackie Bonventre. PSR ¶ 19. The defendant's rise to power began in the early 2000s with his participation in numerous stock fraud and extortion schemes. See United States v. Giallanzo, Criminal Docket No. 06-181. It was on while on pretrial release on his first federal case that the defendant's flagrant disregard for the authority of the court became apparent. On October 13, 2006, approximately seven months after his arrest, the defendant blatantly disregarded the condition of his bond prohibiting him from associating with co-defendants by meeting at the home of a co-defendant. See Bond Revocation Hr'g Tr., id., ECF Dkt. Entry No. 168, at 12-13. At the conclusion of the hearing, the defendant was remanded. Id. at 15 ("I think the government has made a very substantial showing that this defendant will do whatever he wants, will ignore the conditions of bail . . . .").[4]

Despite being sentenced to 87 months in prison for his participation in extortion and related stock fraud schemes, the defendant used those illegitimate proceeds to build his loansharking empire—extending over a million dollars in loans and making weekly collections from his victims, none of which ever detracted from the principal. From behind bars on that case, the defendant continued to grow his loansharking operation. He enlisted violent members of his crime family, such as Padavona and Associate-1, for assistance. He also took advantage of the support given by his actual family, specifically, his brother-in-law, co-defendant Michael Hintze, and had him watch over the loansharking operation on the street. See Giallanzo Ltr. in Support of Hintze, ECF Dkt. No. 311-1, at 6 ("Because I asked Michael to do me a favor that he didn't want to do, he is in the predicament he is in today. The only reason that he did me this favor is because we are family."). And Hintze kept the defendant apprised of the progress of the illicit business through prison visits, call and emails. Instead of being punished for extorting innocent civilians, the defendant victimized many more.

The amount of money the defendant made through this criminal activity is difficult to quantify given the steps he has taken to hide his assets. The Court and the government can only get a glimpse into the scope of his wealth through the Howard Beach mansion he built shortly after his release from prison in 2013 (which is listed for sale for

---

[4] Approximately one week before the defendant met with his co-defendant (identified in the PSR as Associate-2), he directed Associate-1 to set the co-defendant's relative's car on fire. See PSR ¶ 42. The defendant was angry with Associate-2 and suspected he might cooperate with the government.

$2.899 million), his upstate property in the name of a friend valued at $200,000, the Italian ice business his wife "purchased" after his arrest (which happens to be located in the Broad Channel commercial property co-owned by co-defendant Robert Pisani), the land he owns in Davenport, New York valued at $50,000 and the $25,000 motorcycle he "sold" to his brother in March 2018 (the same month he pled guilty). Photographs of the listing of the defendant's Howard Beach mansion depict the opulence of his home, which has served as an outsized symbol of his riches and power in the neighborhood. See Ex. D (photographs of the listing of the defendant's Howard Beach mansion). The cost of the brickwork alone is estimated to exceed a hundred thousand dollars. The home is fitted with custom fixtures, woodwork and window treatments, top-of-the-line appliances, marble and stone throughout, a built-in fish tank, a wine cellar, a home gym, essentially three kitchens (including one outside), an inground pool and perfectly manicured landscaping. Id.; Ex. E (additional photographs of exterior of house and pool).

Though loansharking may have made the defendant the most money, it was not his only criminal activity he committed as part of his membership in the Bonanno crime family. He directed arsons, defrauded an insurance company and ran an illegal gambling business, among other crimes, along the way.[5] PSR ¶¶ 20, 38, 40-42. The defendant's criminality knew no bounds, and the eight years he spent behind bars and his time on supervised release did nothing to slow him down. The defendant totally disregarded the terms of his supervision and repeatedly violated the court's specific order prohibiting his continued association with members of organized crime and convicted felons. A violation report was filed against him in January 2016 containing allegations that the defendant associated with high-ranking members of organized crime and convicted felons—specifically, the leadership of the Bonanno crime family—on multiple occasions. PSR ¶ 293.

In December 2014, the defendant attended a Bonanno crime family meeting at Basilio Inn in Staten Island with the acting street boss of the family and at least nine captains, along with Padavona. In March 2015, the defendant attended a Bonanno crime family meeting in Glendale, New York with the acting street boss, the consigliere and at least eight captains. In September 2015, the defendant attended yet another meeting at a barbershop in Staten Island with the acting street boss, the consigliere, at least 14 captains and Padavona. And finally, in December 2015, the defendant attended another crime family meeting at a restaurant with the acting boss, the consigliere, at least 11 captains and Padavona. PSR ¶ 21. Such Christmas parties are notorious in the organized crime context as occasions for members and associates of organized crime to gather and collect tribute payments on behalf

---

[5] In addition to the crimes he personally committed, the defendant supervised others' offenses, including the obstruction of justice perpetrated by co-defendants Padavona and Tanico. After Tanico was subpoenaed to the grand jury, Padavona and the defendant "spoke several times about the subpoena, including after Tanico's grand jury appearance" during which Tanico perjured himself by lying about, among other things, his connection and communications to Padavona. PSR ¶ 74.

of the crime family. The association violations of the defendant occurred over a year-long time period whereby he met with the entire Bonanno crime family power structure. And, two of the four meetings (March 22 and September 20) occurred on Sundays, a day in which, the government submits, that organized crime figures incorrectly assume law enforcement is not working.

        C.        Reflecting the Seriousness of the Offenses, Promoting Respect for the Law and Providing Just Punishment

A 97-month sentence is necessary to reflect the seriousness of the offenses, promote respect for the law and provide just punishment. 18 U.S.C. § 3553(a)(2)(A). As noted above, the defendant's offenses are serious crimes that are critical to the success of organized crime families and that merit a serious punishment. In addition, by engaging in a life of crime though his sworn allegiance to the Bonanno crime family—after having been convicted of a similar offense and repeatedly violated the terms of his post-release supervision—the defendant has demonstrated that he has no respect for the law or the Court.

The defendant's disrespect for the law was also shown through his repeated lies to the Probation Department that facilitated his continuing criminal activity. When the defendant was released from prison in April 2013 following his first extortion conviction, he had to report employment as a condition of his supervised release. And so co-defendant and loyal associate Robert Pisani nominally gave the defendant a job at the All-American Deli. But the defendant used his employment to further his other business, loansharking. That is where the defendant assaulted John Doe #14 for his non-repayment of a loan, and where John Doe #14's loanshark customers were told to report to explain what they owed. See PSR ¶ 51.

The defendant continued to disrespect the law when he claimed to the Probation Department to be employed by a contractor in 2014. In actuality, the defendant's "employment" consisted of little more than helping construct his own mansion. And while so employed, the defendant collected loansharking payments at his home. See PSR ¶ 73 (stating that John Doe #22 made an interest payment at Giallanzo's home).

The defendant's disregard for the rules of supervised release did not stop there. After being released from prison in December 2016 for his association-related violations, on January 17, 2017, the defendant met with two convicted felons, co-defendant Angelo Moccia and Anthony "Nerd" Mariscano. Under the guise of his daughter's birthday party, the defendant met with his associate Moccia (who collected loanshark payments), who had been convicted of a felony narcotics-related offense in October 2003. Mariscano also has a number of convictions, including an April 19, 1995 misdemeanor conviction for criminal possession of a controlled substance and a September 2, 2003 felony conviction for criminal sale of a hallucinogenic substance. See Detention Memo., ECF Docket No. 5, 31-32.

Given the defendant's repeated failure to abide by the terms of court-imposed rules—instead, continuing his criminal activity at every opportunity—any sentence less than

10

97 months' imprisonment would be insufficient to serve these important purposes of sentencing.

        D.      Affording Deterrence and Protecting the Public

The sentence must afford adequate deterrence to criminal conduct and protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(B) and (C).

        1.      Specific Deterrence

In this case, specific deterrence and incapacitation are critical. As set forth above, the defendant is a long-time member of the Bonanno crime family and was part of its leadership up until his arrest in March 2017. The government respectfully submits that despite any claims to the contrary, aside from those who decide to cooperate against members of the mafia (and therefore are not permitted to maintain a connection to the mafia upon disclosure of their cooperation), few if any members or associates of the mafia give up their connections to the mafia even after serving significant terms of imprisonment.

Furthermore, unlike many criminals, recidivism for individuals involved in the mafia does not decline with age. The defendant's criminal history illustrates both of these points. The 87-month sentence he received on his prior federal case did nothing to deter him from committing future crimes. It did not even temporarily disrupt his criminal activity. By all accounts, his power in the crime family and his loansharking operation grew exponentially during his incarceration. And his allegiance to the crime family—in attending multiple meetings with the top echelon members of the family while on supervised release— confirms that he has no intention of living life disconnected from the mafia. The defendant went as far as using his own family members to facilitate his crimes, i.e. Hintze, because they were people he trusted with his money and people who could not refuse him. Time after time, the defendant made choices that put his immediate family members in the cross hairs of his criminal activity, i.e. by accepting loanshark payments at his home and by having violent criminals such as Padavona and Associate-1 there as well. Any expression of remorse the defendant may express at sentencing, even to his own family, would be hollow given his continued criminal conduct, which the defendant well knows leads to him being separated from them.

        2.      General Deterrence

In addition, a 97-month sentence is necessary to deter others who are in a position to choose between a law-abiding life and a life of crime. At a July 2009 sentencing of a Colombo crime family captain, the Honorable Jack B. Weinstein imposed a sentence of 120 months, significantly above the Guidelines range of 63 to 78 months, and observed the following:

> I believe that under these circumstances, ten years is a sentence
> that is appropriate, not too long, not too great, and anything less

>would not send a message. The people, the youngsters in this
>city have to understand that they cannot join this organization
>and that when they do they destroy their lives.

United States v. Uvino, 07 CR 725 (JBW). Although in this case the government is not seeking a ten-year sentence (or an above Guidelines sentence), the government respectfully submits that the recommended sentence is necessary to deter others from committing crimes and from getting involved in organized crime in the first instance. As Judge Weinstein highlighted, a sentence taking into account general deterrence is essential to send a message to young men in New York City of the consequences of joining the mafia and to deter them from joining in the first place.

Moreover, the defendant is the lead defendant in this significant Bonanno crime family Indictment. The public, particularly members of the Howard Beach community, are following this case. It has been reported on by the media on multiple occasions. Young men, maybe even family members of the defendants charged in this case, are susceptible to the allure of organized crime. They very well may look up to those like the defendant and could be contemplating similar lifestyles. The government urges the Court to send a message: that this is not a life they want to choose because it will be met with harsh consequences.

## V. Restitution and Forfeiture

The government respectfully requests that the Court impose the restitution amounts listed in the chart contained in the PSRA. As to forfeiture, the defendant is required to pay $300,000 by the date of his sentencing, which he has yet to pay. The additional forfeiture terms the defendant is responsible for satisfying (although he has additional time to do so) are outlined in his plea agreement. They require him to, among other things, sell his Howard Beach mansion and pay an additional $950,000. The defendant's failure to satisfy any of his forfeiture obligations would mean he is in breach of the forfeiture order (and his plea agreement).

## VI. VOSR Sentence

On June 7, 2018, the defendant pleaded guilty to a violation of supervised release ("VOSR") stemming from his guilty plea on the Indictment. Although the advisory Guidelines range is 12 to 18 months, given all of the circumstances here, such a sentence would be inappropriate. As would a concurrent sentence, if the defendant should make such a suggestion. Given the defendant's repeated violations and breach of the Court's trust, the government respectfully requests that the Court impose a 24-month sentence on the VOSR to run consecutive to the sentence imposed on Count One of the Indictment.

A. <u>Applicable Law</u>

A district court has "broad discretion" in the context of sentencing on a VOSR, which can mean revoking supervised release and ordering a term of imprisonment followed by additional supervision.  See <u>United States v. Wirth</u>, 250 F.3d 165, 169 (2d Cir. 2001).  "There is no sentencing guideline governing violations of supervised release."  <u>United States v. Pelensky</u>, 129 F.3d 63, 68 (2d Cir. 1997).  Instead, there are "policy statements found in Chapter Seven of the Guidelines manual," <u>id.</u> at 69, which the Court should consider but can "freely" disagree with by imposing a sentence outside of the suggested range, <u>United States v. McNeil</u>, 415 F.3d 273, 277 (2d Cir. 2005).  "In imposing a sentence for violation of supervised release, the sentencing judge may freely impose a term lower or higher than the recommended Guidelines range."  <u>McNeil</u>, 415 F.3d at 277.

Moreover, the Court's sentence may exceed the sentencing range in the Guidelines policy statement without notice of a potential upward departure based on a ground not previously identified by the Probation Department or the government.  <u>Pelensky</u>, 129 F.3d at 70 (holding that the "notice requirement does not apply to deviations from the non-binding policy statements found in Chapter Seven of the Guidelines"), <u>accord</u> <u>United States v. Hargrove</u>, 497 F.3d 256, 260-61 (2d Cir. 2007) (affirming <u>Pelensky</u> in the post-<u>Booker</u> regime:  "The notice requirement continues to make sense in the initial sentencing context, but does not, thereby, extend automatically to the context of revocation of supervised release.").  Accordingly, "[w]hen imposing a sentence for violation of supervised release, the court is bound only by the statutory maximum imposed by Congress, and is therefore under no obligation to provide notice to defendants of its intent to exceed the non-binding sentencing ranges recommended in Chapter Seven of the Guidelines."  <u>Pelensky</u>, 129 F.3d at 71.

The Court is, however, still required to explain its reason for exceeding the recommended range.[6]  Failure to provide written explanations is a frequent cause of remands

---

[6] The Court should articulate these reasons with specificity, particularly if it agrees with the government and sentences the defendant above Chapter Seven's recommended range.  See <u>United States v. Aldeen</u>, 792 F.3d 247, 254-55 (2d Cir. 2015) (vacating an above-Guideline sentence on a VOSR because the district court did not provide a detailed explanation "sufficiently compelling" to justify a "major deviation from the Guidelines range" and failed to complete Part IV(C) of its statement of reasons form); <u>United States v. Gonzalez</u>, 529 F.3d 94, 98-99 (2d Cir. 2008) (vacating a sentence on a VOSR that more than doubled the Guideline recommendation, explaining that district court is "statutorily required" to state in open court reasons for its sentence and "[w]here, as here, the sentence is outside of an advisory Guidelines range, the court must also state with specificity in the written order the specific reason for the sentence imposed" (internal quotation marks omitted)).  But see <u>Aldeen</u>, 792 F.3d at 251 ("Though the imposition of an above-Guidelines sentence triggers a higher descriptive obligation, we simultaneously require less rigorous specificity where, as here, a court sentences a defendant for violation of supervised release." (internal citation and quotation marks omitted)); <u>United States v. Verkhoglyad</u>, 516 F.3d 122, 132-33 (2d Cir. 2008) ("[A] court's statement of its reasons for going beyond non-binding policy statements in imposing a sentence after revoking a

13

of VOSR sentences in the Second Circuit. See, e.g., United States v. Chandler, 543 F. App'x 78, 81-82 (2d Cir. 2013) (remanding for the district court to amend its written judgement to comply with 18 U.S.C. § 3553(c)(2)); United States v. Sanders, 269 F. App'x 67, 69 (2d Cir. 2008) (same).

Additionally, in the VOSR context, courts are directed to particular § 3553(a) factors and guided by the policy of punishing breaches of the court's trust. Specifically, courts must consider all of the § 3553(a) factors except subsections (a)(2)(A) (seriousness of the offense) and (a)(3) (the kinds of sentences available). See 18 U.S.C. § 3583(e). Although the Court need not consider these omitted factors, it is permitted to consider such factors. United States v. Williams, 443 F.3d 35, 47 (2d Cir. 2006) ("Section 3583 does not state that any particular factor cannot be considered, we interpret § 3583(e) simply as requiring consideration of the enumerated subsections of § 3553(a), without forbidding consideration of other pertinent factors.").

Ultimately, "at revocation the court should sanction primarily the defendant's breach of trust, while taking into account, to a limited degree, the seriousness of the underlying violation and the criminal history of the violator." U.S.S.G. Ch. 7, Pt. A (Introduction), ¶ 3(b). Accounting for the breach of trust is therefore "the primary goal of a sentence for a violation of supervised release." United States v. Gonzalez, 634 F. App'x 15, 18 (2d Cir. 2015) (summary order) (citing United States v. Sindima, 488 F.3d 81 (2d Cir. 2007)). For this reason, where a defendant is punished for an offense underlying a violation of supervised release, "the sanction for the violation of trust should be in addition, or consecutive, to any sentence imposed for the new [criminal] conduct." U.S.S.G. ch. 7, pt. A, intro. comment (3)(b) (emphasis added); see also U.S.S.G. § 7B1.3(f) ("Any term of imprisonment imposed upon the revocation of probation or supervised release shall be ordered to be served consecutively to any sentence of imprisonment that the defendant is serving, whether or not the sentence of imprisonment being served resulted from the conduct that is the basis of the revocation of probation or supervised release.").

B.  Argument

Here, the defendant's latest violation of supervised release reflects yet another egregious breach of the Court's trust. The defendant has been committing crimes since he began his term of supervised release. The year-and-a-day sentence the defendant received from the Honorable Nicholas G. Garaufis in March 2016 for association violations had no impact on the defendant. He resumed his loansharking activities immediately upon his release from jail as evidenced by the crimes charged in the Indictment and the predicate acts the defendant allocuted to, some of which extended to September 2017. He also met with two felons after his release, including co-defendant Angelo Moccia, who regularly collected loanshark payments on the defendant's behalf.

---

defendant's probationary term need not be as specific as has been required when courts departed from guidelines that were, before Booker, considered to be mandatory.").

14

A sentence of less than 24 months' imprisonment would send a message to this defendant and other defendants at large that this behavior—flouting the Court's rules about committing crimes while on supervised release—is a minor violation. The defendant pleaded guilty to his role in a racketeering conspiracy and allocuted to victimizing multiple people on behalf of the Bonanno crime family; his continued serious criminal activity and association with the crime family warrant an above-Guidelines sentence. See U.S.S.G. § 7B1.4 comment.N.3 (providing for upward departure for violations associated with "high risk of new felonious conduct," such as a defendant under supervision for criminal sexual abuse, who violates the condition that he not associate with children by loitering near a schoolyard).

For these reasons, a 24-month consecutive sentence on the VOSR is should be imposed.

VII.   Conclusion

Given all of the facts and circumstances discussed above, any leniency toward the defendant is unwarranted and would not satisfy the statutory purposes of sentencing. United States v. Cutler, 520 F.3d 136, 154 (2d Cir. 2008) (concluding "that there were errors in certain of the district court's Guidelines applications and in its departure decisions; that the sentences imposed did not properly interpret certain of the sentencing factors that the court was required to consider under 18 U.S.C. § 3553(a), such as just 'punishment' and deterrence of others; and that some of the court's rationales would promote disrespect for the law.").

      For the foregoing reasons, the government respectfully submits that the Court sentence the defendant to 97 months' imprisonment on Count One of the Indictment with a consecutive 24 month term of imprisonment on the VOSR.

          Respectfully submitted,

          RICHARD P. DONOGHUE
          United States Attorney

By:      /s/
          Lindsay K. Gerdes
          Keith D. Edelman
          Assistant U.S. Attorneys
          (718) 254-6155/6328

Encl.

cc:    Clerk of Court (DLI) (by Hand and e-mail)
       Elizabeth Macedonio, Esq., and Charles Carnesi, Esq. (by e-mail)
       Michelle Murphy and Shayna Bryant, Senior Probation Officers (by e-mail)